**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ASSOCIATED COMMUNITY BANCORP, | : | |
| INC., et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:09-CV-1357(JCH) |
| v. | : | |
| | : | |
| THE TRAVELERS COMPANIES, INC., et al., | : | |
| Defendants. | : | APRIL 7, 2010 |
| | : | |

**RULING RE: MOTION TO DISMISS (Doc. No. 32) &**
**MOTION TO STRIKE (Doc. No. 42)**

## I.     INTRODUCTION

Plaintiffs Associated Community Bancorp, Inc, ("Associated"), Connecticut

Community Bank, N.A. ("CCB"), Westport National Bank ("Westport"), and

Dennis P. Clark brought this action against defendants The Travelers

Companies, Inc. ("Travelers") and St. Paul Mercury Insurance Company ("St.

Paul").  In their Second Amended Complaint, plaintiffs allege a breach of

contract for failure to provide coverage under an insurance policy that the

plaintiffs purchased from defendants.  See Second Am. Compl. at 10 (Doc. No.

30).  Plaintiffs also seek declaratory judgments as to the defense costs and

indemnity provided by the policy.  See id. at 11-12.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants move

this court to dismiss plaintiff's Second Amended Complaint in its entirety for

failure to state a claim.  See Mot. to Dismiss (Doc. No. 32).  Alternatively,

defendants move the court to dismiss Claim Three of the Second Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because it is not ripe for adjudication.  See id.  Finally, Travelers asks for judgment as a matter of law and to be dismissed from the case because it is not a party to the policy in dispute.  See id.  For the reasons set forth below, the Motion to Dismiss is granted.

## II.    FACTS[1]

Associated is a bank holding company incorporated in Delaware with a place of business in Greenwich, Connecticut.  CCB, a wholly-owned subsidiary of Associate, is a nationally chartered bank with a place of business in Westport, Connecticut.  Dennis Clark is an officer at CCB.  Westport is a division of CCB, with a place of business in Westport, Connecticut.  Travelers is an insurance company organized and operating under the laws of Minnesota, with a place of business in Hartford, Connecticut.  St. Paul, an affiliate of Travelers, is an insurance company organized and operating under the laws of Minnesota, doing business in Connecticut.

Defendants sold Associated, CCB, and Westport an insurance policy ("the Policy"), which provided coverage to plaintiffs and their officers and directors. The initial period of the Policy was June 1, 2008 to June 1, 2009, which was later extended until September 1, 2009.  Plaintiffs paid premiums for the period of coverage and are Insureds within the meaning of the Policy.  The Policy provides insurance coverage, with certain exclusions, for loss incurred on claims made or

---

[1]The facts are taken from the Second Amended Complaint, unless otherwise noted.

2

discovered during the policy period, as well as for defense costs related to those claims.

CCB, Westport, and Clark are defendants in four pending lawsuits.[2]  The plaintiffs in these underlying suits ("the investors") lost money in the Ponzi scheme run by Bernard L. Madoff Investment Securities, LLC ("Madoff").  The investors entered into a custodian agreement with Westport, in which the investors allegedly directed Westport to give Madoff "full discretionary authority" to invest their funds.  As custodian, Westport transferred and redeemed funds from Madoff, and performed certain tasks such as record keeping and tax reporting.  Another individual has made an additional claim regarding the Madoff custodian agreements, but no lawsuit has yet been filed.  Westport claims that it was unaware of the Ponzi scheme that Madoff was running during this time period.  The investors seek the return of their lost investments and the fees they paid Westport.  See, e.g., Class Action Complaint, Levinson v. PSCC Servs. ("Levinson Complaint"), Ex. B to Def.'s Mem., at ¶ 82, 87, 94, 103, 117-119, 121-123

The plaintiffs notified defendants of the lawsuits and claim, all of which were filed or made during the policy period.  Plaintiffs allege that these claims are covered by the Policy, and thus defendants have an obligation to provide defense costs and other losses.  Plaintiffs have incurred costs in the defense of

---

[2] The underlying suits are: Levinson v. PSCC Servs., Inc., Ex. 2 to Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem."); Backus v. Conn. Cmty. Bank N.A., Ex. 3 to Def.'s Mem.; Abramowitz v. Westport Nat'l Bank, Ex. 4 to Def.'s Mem.; Sklar v. Conn. Cmty. Bank N.A., Ex. 5 to Def.'s Mem.

the investors' lawsuits and have requested that defendants cover these costs.

Defendants have refused to cover the defense costs and have stated that they

will refuse to pay any loss incurred by the plaintiffs in connection with the

investors' lawsuits.

## III.    STANDARD OF REVIEW

In deciding a motion to dismiss, the court accepts the allegations of the

Complaint as true and construes them in a manner favorable to the pleader.

See, e.g., Hoover v. Ronwin, 466 U.S. 558, 587 (1984); Phelps v. Kapnolas, 308

F.3d 180, 184 (2d Cir. 2002).  The court must draw all reasonable inferences in

the plaintiff's favor.  See, e.g., Yung v. Lee, 432 F.3d 142, 146 (2d Cir. 2005).

A motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6),

tests only the adequacy of the complaint.  See United States v. City of N.Y., 359

F.3d 83, 87 (2d Cir. 2004).  Bald assertions, and mere conclusions of law, do not

suffice to meet the plaintiff's pleading obligations. See Amron v. Morgan Stanley

Inv. Advisors Inc.,464 F.3d 338, 344 (2d Cir. 2006).  Instead, plaintiffs are

obliged to "amplify a claim with some factual allegations in those contexts where

such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490

F.3d 143, 157-58 (2d Cir. 2007), rev'd on other grounds sub. nom. Ashcroft v.

Iqbal, 129 S. Ct. 1937 (2009). The "plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully."  Ashcroft, 129 S. Ct. at 1949.

4

IV.    **DISCUSSION**

In Connecticut, a court's interpretation of an insurance contract must attempt to discern the intent of the contracting parties, as evidenced by the policy terms.  See Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co., 247 Conn. 801, 805 (1999).  When the policy terms are ambiguous, the ambiguity must be construed against the insurance company, who was the drafter of the policy.  See id. at 806.  When there is no ambiguity, however, the court must give effect to the plain meaning of the policy's language.  See id.  The determination of whether a policy is "clear and unambiguous" is a question of law.  See Isham v. Isham, 292 Conn. 170, 181 (2009).  "The fact that the parties advocate different meanings of the [insurance policy] does not necessitate a conclusion that the language is ambiguous."  See Springdale Donuts, Inc., 247 Conn. at 806.  Contract language is unambiguous when it has a "definite and precise meaning" about which "there is no reasonable basis for" different interpretations.  See Isham, 292 Conn. at 181 (internal citations omitted).  A court will not "torture words to import ambiguity" where there is none.  See id.

Under the Policy, defendants were required to advance defense costs, but did not have a duty to defend.  See Policy Declarations, Ex. A to Pl.'s Opp., at WNB00014-15.  However, both parties agree that the duty to advance defense costs is analyzed under the same standard as that for a duty to defend.  See Def.'s Mem. at 12 n.7; Pl.'s Mem. in Opp. ("Pl.'s Opp.") at 10; see also Lowy v. Travelers Prop. & Cas. Co., 2000 U.S. Dist. LEXIS 5672, at *6 n.1 (S.D.N.Y. May 1, 2000).  An insurer has a duty to defend any claim against its insured "unless it

5

can establish as a matter of law, that there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify [the] insured under any policy provision."  R.T. Vanderbilt Co. v. Cont'l Cas. Co., 273 Conn. 448, 473 n.28 (Conn. 2005).  The duty is determined by referring to the allegations contained in the underlying complaint.  See DaCruz v. State Farm Fire & Cas. Co., 268 Conn. 675, 687 (Conn. 2004).  The underlying complaint need only "allege facts that *potentially* could fall within the scope of coverage" in order to trigger the duty.  See id. at 688 (emphasis in original).  However, there is no duty to defend a case for which, as a matter of law, there is no coverage. See R.T. Vanderbilt Co., 273 Conn. at 473 n.28.

Defendants argue that the Investors' lawsuits do not fall within the Policy's coverage, because they fall under several exclusions in the Policy: the insolvency exclusion, written representations of prior performance exclusion, and fee exclusion of the Professional Services Liability Coverage.  Additionally, defendants argue that plaintiffs' request for a declaratory judgment is not ripe, and that Travelers is entitled to judgment as a matter of law because it did not issue the Policy to plaintiffs and is thus not a party.

Plaintiffs argue that they have made a "factual allegation" that the claims made are "within the scope of the coverage of the Policy," see Pl.'s Mem. at 8-9, and therefore they have met the burden for defeating a motion to dismiss.  While the court must accept as true any factual allegations, the scope of coverage is a question of law, and an allegation of "within the scope of the coverage" is not a factual allegation.  Based on the facts alleged in the Second Amended

6

Complaint and before the court (the Policy language and the underlying complaints), the court will address the legal issue raised in the defendants' Motion to Dismiss.

A.    Insolvency Exclusion

The Policy expressly states:

> . . . [T]he Insurer shall pay on behalf of the Insureds Loss for which the Insureds become legally obligated to pay on account of any Claim first made against them . . . during the Policy Period . . . for a Professional Services Act taking place before or during the Policy Period.

See Bankers Professional Liability Insuring Agreement ("Professional Services Agreement"), Ex. A to Pl.'s Opp., at WNB00027.[3]  A "Professional Services Act" is defined as:

> [A]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed by any Insured in the rendering or failure to render Professional Services.

See General Terms, Conditions and Limitations ("General Terms"), Ex. A to Pl.'s Opp., at WNB00060.

Defendants first argue that coverage of the plaintiffs' claims is barred under the insolvency exclusion to the Professional Services Liability Coverage. See Def.'s Mem. at 14-17.  The insolvency exclusion states that the Policy does not cover:

---

[3] Throughout this Ruling, the court will refer to the version of the Policy provided as an exhibit to the plaintiffs' Opposition.  See Policy, Ex. A to Pl.'s Opp.  Plaintiffs argue that the version of the Policy provided by the defendants with their Motion to Dismiss contains an updated "General Terms" section that was not part of the Policy at the time the parties entered into it.  See Pl.'s Opp. at 29-30.  Although defendants dispute that plaintiffs never received the updated General Terms, defendants agree, for the purposes of the Motion to Dismiss, that the court should use the version of the Policy provided by plaintiffs.  See Def.'s Reply at 11 n.9 (Doc. No. 41).

7

> Loss [including Defense Costs] on the account of any claim made against any Insured . . . based upon, arising out of or attributable to the insolvency, . . . receivership, bankruptcy, or liquidation of, or financial inability to pay . . .  by, any . . . investment company, . . . or any broker or dealer in securities or commodities. . . .

See Professional Services Agreement at WNB00029.  The defendants argue that the investors' claims "arose out of" Madoff's insolvency or inability to pay, because the investors would not have filed claims against the plaintiffs if they had been able to recover their funds from Madoff.  See Def.'s Mem. at 13.  Thus, defendants argue, these claims fall under the insolvency exclusion, and there is no coverage for plaintiffs' claims.

       1.        Connection Between Claims and Insolvency

Connecticut courts have interpreted the term "arising out of" broadly in the context of insurance contracts.  See Bd. of Educ. of City of Bridgeport v. St. Paul Fire & Marine Ins. Co., 261 Conn. 37, 48 (2002)(quoting Hogle v. Hogle, 167 Conn. 572 (1975)).  Liability for an injury "arises out of" an occurrence or offense where the injury "'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' that occurrence or offense; the phrase generally indicates a causal connection."  See id.  Further, the insured's alleged conduct need not be the proximate cause for the injury.  See id. (stating under the standard of causation required for "arising out of" liability, "it need not be shown that the incident in question was proximately caused by the vehicle for coverage to attach."[4])

---

[4] Here, the "incident" would be Madoff's bankruptcy or inability to pay.  The "vehicle" here would be the plaintiff's conduct.

Following Connecticut's rules of contract construction, this court finds that any reading of the plain language of the insolvency exclusion excludes coverage of the investors' claims.  The underlying lawsuits are certainly connected with, incident to, or flow out of Madoff's insolvency.  Had Madoff not become insolvent and lost the investors' money, the investors would have had no damage and thus no reason to file suit against Westport.  Therefore, there is a causal connection between the insolvency and the claims.  The language of the exclusion is broad – it covers "any claim" arising out of the insolvency of "any investment firm."  A plain reading of the exclusion gives it a "definite and precise meaning," which excludes coverage of just these sorts of claims.  The court will not torture the language of the exclusion in order to find an ambiguity where none exists.

The above reading of the insolvency exclusion is supported by other courts.  The Middle District of Pennsylvania recently addressed a case with strikingly similar facts.  See Smith v. Continental Casualty Company, 2008 WL 4462120 (M.D. Pa. 2008).  In that case, the Smiths hired a financial planner, Sprecher, to handle their retirement investments.  Sprecher recommended that the Smiths place their funds in an offshore asset protection trust, Evergreen.  Evergreen turned out to be a Ponzi scheme, which eventually went bankrupt.  The Smiths sued Sprecher, who was covered by a professional services liability policy issued by Continental.  See id. at *3-*4.  Continental denied coverage of the Smiths' claims based on an insolvency exclusion which denied coverage for: "Claims arising out of insolvency, receivership, bankrupcty or inability to pay of any organization . . . in which the Insured has, directly or indirectly, placed the

9

funds of a client or account. . ."  See id. at *6.  The Middle District of

Pennsylvania found that the Smiths' claims arose out of Evergreen's bankruptcy

because, "were it not for these circumstances, the Smiths would not have filed

suit against Sprecher."  See id. at *13.  Thus, the Smith court held that the

insolvency exclusion barred coverage for the Smiths' claims.  See id.  Although

the Smith court was interpreting Pennsylvania law, under which "arising out of"

requires only "but for" causation, see id., this court still finds its reasoning

persuasive in light of the similar facts.

Three state court cases on which the Second Circuit and other federal

courts have relied when analyzing insolvency exclusions also provide guidance.

See, e.g., Coregis Ins. Co. v. Am. Health Found., 241 F.3d 123 (2d Cir. 2001);

Transamerica Ins. Co. v. South, 975 F.2d 321 (7th Cir. 1992); Employers Ins. v.

Tri World Ins. Agency, 1998 U.S. App. LEXIS 969 (9th Cir. 1998).  In Kleneic v.

White Lake Marine Corp., 533 N.Y.S.2d 909 (N.Y. App. Div. 1988), the policy at

issue excluded coverage for "any claim arising out of or in connection with the

financial inability to pay, insolvency, receivership, bankruptcy or liquidation of any

insurer."  See id. at 910.  The New York appellate court found this language to

be "clear and broad" and that it covered the claim at hand.  See id.  In St. Paul

Fire & Marine Ins. Co. v. Cohen-Walker, Inc., 171 Ga. App. 542 (Ga. Ct. App.

1984)(hereinafter Cohen-Walker), the policy at issue read, "We won't cover

claims resulting from the inability of an insurance company to pay its debts."  See

id. at 543.  The Georgia appellate court found the insurance policy to be "clear

and unambiguous."  See id. at 544.  The court noted that, although the claims in

10

the underlying suit dealt with the negligence of the party procuring the insurance, the injury giving rise to the cause of action was "the recommended insurance company's inability to pay his claim . . . due to said company's insolvency." See id. at 545.

Finally, in Barron v. Scaife, 535 So.2d 830 (La. Ct. App. 1988), the policy at issue excluded "claims made against the insured arising from or related to . . . the insolvency, receivership, bankruptcy or liquidation of any insurance company." See id. at 832. Again, the Louisiana appellate court held this language to be "clear and unambiguous," and found that there could be "no alternative interpretation of the language." See id. at 832-33. The Second Circuit, which analyzed these three cases and others when addressing a more narrowly written insolvency exclusion, stated that "most courts have held that insolvency exclusions in such policies apply despite the fact that liability for such claims is premised on mistakes made prior to the insolvency by persons independent of the insolvent entity." See Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 130-31 (2d Cir. 2001).

Although the underlying facts are different, the general structure of claims in this case is quite similar to those in Kleneic, Cohen-Walker, and Barron. In those three cases, the party in interest performed a service (recommending an insurance company). Once the recommendee discovered the insolvency of that insurance company, it sued the recommending party for negligence, and that party then turned to its own liability insurance company for coverage. In the present action, the plaintiffs performed a service for the investors (placing their

11

money in Madoff accounts).  Once the investors discovered that Madoff had become insolvent, they sued the plaintiffs for negligence, among other claims, and plaintiffs turned to defendants for coverage under their liability insurance. The analyses of the Kleneic, Cohen-Walker, and Barron courts are persuasive. All three courts read similar policies to be clear and unambiguous, and to exclude coverage of the underlying claims; this court has come to the same conclusion in the present action.

This court finds a similar case in the Fourth Circuit to be equally persuasive.  The claims in American Automobile Ins. Co. v. Valentine,[5] which involve the recommendation of an insurance fund which later went bankrupt, are nearly identical to those in Kleniec, Cohen-Walker, and Barron.  See Am. Auto. Ins. Co. v. Valentine, 131 Fed. Appx. 406 (4th Cir. 2005).  In the Valentine case, the policy at issue, as here, excluded "[a]ny claim arising out of the insolvency, receivership, bankruptcy, liquidation, or financial inability to pay of any organization in which the insured has (directly or indirectly) placed or obtained coverage . . . "  See id. at 407-08.  The Fourth Circuit was applying South Carolina law, which requires, as does Connecticut, a "causal connection between the excluded risk and the loss."  See id. at 409.   The Fourth Circuit found that the above exclusionary clause "unambiguously bars coverage with respect to the underlying suits."

The Valentine court went on to state that, "[w]hile the participants allege a

_____

[5]The court recognizes that this case is unpublished and cites to it only for its persuasive power.

host of legal claims, they are, at bottom, seeking damages for unpaid medical claims, claims that went unpaid because the Fund became insolvent.  Because a causal connection exists between the excluded risk (the placement of clients' funds with an insolvent organization) and the underlying suits, we conclude that the brokers' claims for coverage fit squarely within the exclusionary clause relating to insolvency."  See id. at 409-10.  That same causal connection seen by the Fourth Circuit in Valentine exists in this case.  Although the underlying suits are for negligence, breach of contract and breach of fiduciary duty, those claims only exist because Madoff became insolvent.

Plaintiffs argue that, "Where an insurance company intends that such a policy exclusion should exclude coverage in situations that arise due to the acts of a third party, and not due to acts of the insured itself, the insurance company must provide so explicitly."  See Pl.'s Opp. at 15.  Thus, because the underlying claim in this case was "due to an insolvency caused by a third party," and the Policy doesn't explicitly exclude such claims, plaintiffs argue that the Policy is ambiguous and should be interpreted against the defendants (and thus cover plaintiffs' claims and require defendants to advance defense costs).  See id. at 14-15.  Plaintiffs' argument largely rests on a Sixth Circuit case, Westport Ins. Corp. v. Energy Fin. Servs., Inc..  See 2009 U.S. App. LEXIS 6218 (6th Cir. 2009).

In Westport, the Sixth Circuit held that a claim in which a third party caused the insolvency was not excluded from a policy excluding "any claim arising out of or in connection to" insolvency.  See Westport, 2009 U.S. App.

13

LEXIS 6218, at *6-*7.  However, the Sixth Circuit was expressly relying on an earlier decision by the Kentucky Supreme Court to make its holding.  See id. ("If we are to follow the Kentucky Supreme Court's . . . reasoning – as we are obliged to do in this diversity case – then we must read the exclusion clauses in the . . . policies as excluding coverage only if the recommending party . . . did something to cause or contribute to the recommended insurer's . . . insolvency.") The relied-on ruling of the Kentucky Supreme Court, St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223 (Ky. 1994)(hereinafter P-W-M), has not been followed by any court outside of Kentucky.

The P-W-M court found the insolvency exclusion would be incompatible with the overall insurance policy, which protected against liability arising out of the "wrongful acts" of the insured, if it excluded claims arising out of insolvencies in which the insured had done no wrong.  See P-W-M at 226.  Thus, the Kentucky Supreme Court found the insolvency exclusion to be ambiguous and interpreted it in favor of coverage.  See id. at 227.

This court is not obligated to follow a decision of the Kentucky Supreme Court.  The court has determined that the language of the insolvency exclusion in this case is unambiguous, see supra at 7, and can find no reasonable basis to write in a requirement that the insolvency be caused by the Insured.  Connecticut law is clear that "courts do not rewrite contracts."  See Gibson v. Capano, 241 Conn. 725, 732 (Conn. 1997).  Although the P-W-M court found that it would have been a "relatively simple matter" for the drafting party to make it clear that the exclusion applied to all instances of insolvency, regardless of fault, see P-W-

14

M, 870 S.W.2d at 227, this court reads "any claim" in exclusion at issue to mean

just that – any claim.  It would be torturing the words of the exclusion to read any

ambiguity into them, which this court will not do.

Additionally, as noted above, the Second Circuit has stated in dicta that

most courts hold insolvency exclusions to apply despite the fact that the

underlying claims are made against parties utterly "independent" of the insolvent

party.  See Coregis, 241 F.3d at 130-31.  Therefore, this court finds the plaintiffs'

argument that a third-party requirement must be written in to make the exclusion

unambiguous to be unpersuasive.  Furthermore, this court also does not see the

incompatibility found by the P-W-M court.  The P-W-M court read the exclusion,

if applied, to mean that "inability to pay could exist without a wrongful act having

been committed."  See P-W-M, 870 S.W.2d at 226.  In the Policy at issue here,

although the claims arise out of Madoff's bankruptcy, the plaintiffs are being

sued for alleged negligence in monitoring the funds placed in Madoff accounts.

Thus, the plaintiffs are, in fact, being sued for an allegedly wrongful act.  Such

wrongful acts, according to the clear language of the insolvency exclusion, are

not covered by the Policy.  The court sees no incompatibility in the clear,

unambiguous terms of the contract.

Plaintiffs also argue that the use of the phrase "directly or indirectly" in the

insolvency exclusion of three cases relied upon by the defendants supports

plaintiffs' argument that the Policy at issue is ambiguous.  See Pl.'s Mem. at 18-

20.  In Smith, the policy excluded "[c]laims arising out of insolvency . . . of any

organization . . . in which the Insured has, directly or indirectly, placed the funds

15

of a client or account. . ."  See Smith, 2008 WL 4462120, at *6 (emphasis

added).  The Valentine policy is similar, including the "directly or indirectly"

modifier in the same position within the exclusion.  See Valentine, 131 Fed.

Appx. at 407-08.  In this case, the relevant question is whether the claims "arise

out of" the insolvency.  In both Smith and Valentine, the "arising out of" phrase is

unmodified by the term "directly or indirectly" – instead, that phrase modifies

whether the insured party placed the funds (directly or indirectly) with the

insolvent entity.  Therefore, the Fourth Circuit's and the Middle District of

Pennsylvania's analyses of the "arising out of" language is still persuasive to the

court in this case.

        Plaintiffs also attack defendants' reliance on Transamerica Ins. Co. v.

South, 975 F.2d 321 (7th Cir. 1992).  See Pl.'s Opp. at 18-19.  In Transamerica,

the policy excluded coverage for "[a]ny claim arising out of insolvency,

receivership or bankruptcy of any organization (directly or indirectly). . . ."  See id.

at 323.  Plaintiffs claim that the Seventh Circuit found the phrase "directly or

indirectly" to be "critical," and thus any exclusion lacking it is ambiguous.  See

Pl.'s Mem. at 18.  However, the Seventh Circuit found the phrase important only

because Illinois state courts had interpreted the term "arising out of" to be vague,

and the modifier was required to make it more specific and thus, unambiguous.

See Transamerica, 975 F.2d at 329.  The Seventh Circuit did not address the P-

W-M concept of "third-party" ambiguity.  In fact, the Transamerica court found

that the underlying claims (similar to those in Kleneic, Cohen-Walker, and

Barron) arose *directly* out of the insolvency, because "the plaintiffs would have

16

suffered no injury" had there been no insolvency, and thus would have been unable to assert any claims.  See id. at 328-39.  Therefore, despite the inclusion of the "directly or indirectly" language, the holding of Transamerica supports this court's conclusion – that the investors' claims "arise out of" the Madoff insolvency.

> 2.  Meaning of "Investment Company" or "Broker or Dealer in Securities"

Plaintiffs next argue that Madoff was not an "investment company" or "broker or dealer in securities," as defined by the Policy, but instead was a "criminal enterprise."  See Pl.'s Opp. at 21.  Plaintiffs argue that, if the defendants intended to exclude claims such as the investors' claims, it should have extended the definition to include "sham investment companies and broker/dealers."  See id. at 23.  At the very least, plaintiffs argue that this creates an ambiguity, which should be construed in their favor.  See id.

Plaintiffs' sole source of law for this argument is an Eastern District of New York case interpreting the Sentencing Guidelines, U.S. v Sirotina.  See 318 F. Supp. 2d 43 (E.D.N.Y. 2004).  The Sirotina court refused to apply a four-level enhancement for an offense that "substantially jeopardized the soundness of a financial institution" where the financial institution itself was a sham organization.  See id. at 45.  This court does not find Sirotina to be persuasive in the context of a contract interpretation case.  The Sirotina court repeatedly emphasizes that the guideline provision must be viewed in the context of sentencing.  See id. at 45-46.  The court notes, "This provision imposes sanctions for the additional impact

of the fraud on a legitimate organization . . . .  To apply this guideline not to the victim but to the perpetrator makes no sense."  See id. at 46.  Such analysis has no relationship to the interpretation of an insurance contract in a civil action.

Furthermore, the insolvency exclusion does cover "sham investment companies," because it covers claims arising out of the insolvency of "any . . . investment company." See Professional Services Agreement (emphasis added).  Madoff was registered as a broker-dealer with the Securities and Exchange Commission.  See Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC, 401 B.R. 629, 632 (Bankr. S.D.N.Y. 2009).  Thus, Madoff certainly falls within the plain meaning of "any" investment company or broker or dealer in securities.  Simply because this is a broad term does not mean that it is ambiguous, see Coregis, 241 F.3d at 129, and the court does not find it to be ambiguous.

3.     Meaning of "Insolvency" or "Bankruptcy"

Finally, plaintiffs argue that the terms "insolvency," "bankruptcy," or "financial inability to pay" do not cover situations such as the one at issue here, that is, the massive fraud and Ponzi scheme perpetrated by Madoff.  See Pl.'s Opp. at 23-24.  Relying on definitions from dictionaries and the Connecticut Uniform Commercial Code using the phrase "in the ordinary course of business," plaintiffs argue that "'insolvency,' as the term is commonly used, contemplates the situation where a formerly solvent business becomes insolvent . . . as a result of legitimate business activity."  See Pl.'s Opp. at 23-24.

Plaintiffs, in making their argument, state that courts should give terms

18

their "plain and ordinary meaning."  See Pl.'s Opp. at 23.  The court notes that

this exclusion does not rest solely on the term "insolvency."  It also excludes

claims arising out of "bankruptcy" and "financial inability to pay."  Bernard L.

Madoff Investment Securities is currently undergoing bankruptcy proceedings in

the Southern District of New York.  See, e.g., Secs. Investor Prot. Corp. v.

Bernard L. Madoff Inv. Secs., LLC, No. 08-1789 (Bankr. S.D.N.Y., filed Dec. 11,

2008).  Thus, giving the word "bankruptcy" its plain and ordinary meaning,

Madoff is undergoing bankruptcy, and the investors' claims arise out of that

bankruptcy.  See supra at 7-13.  Additionally, the investors' claims are based on

the fact that all of their savings in their accounts with Madoff were lost.  See, e.g.,

Levinson Complaint at ¶ 4.  Thus, the claims arise out of Madoff's "financial

inability to pay," using the plain meaning of that term.

The insolvency exclusion is disjunctive, with "insolvency" being separated

from "bankruptcy" and "financial inability to pay" with the word "or."  Thus, even if

the court were to accept the plaintiffs' definition of "insolvency," the claims are

covered under the plain and ordinary meaning of "bankruptcy" and "financial

inability to pay."  The court sees no ambiguity in this language.

### 4.    Summary

Because the court has determined that the terms of the insolvency

exclusion are unambiguous, it must give effect to the plain meaning of that

clause.  The investors' claims "arose out of" the bankruptcy or financial inability

to pay of Madoff, a broker or dealer in securities, and thus, those claims are

excluded from coverage by the insolvency exclusion of the Professional Services

Agreement.  Because the court holds that the plaintiffs' claims for coverage under this Agreement are barred by the insolvency exclusion, it need not address the defendants' arguments concerning other exclusions included in the Professional Services Agreement that also bar coverage of the plaintiffs' claims.

B.    Professional Services Exclusion

Plaintiffs argue that, even if the insolvency exclusion of the Professional Services Agreement bars coverage of their claims, they have also sought coverage under the Management Liability Insuring Agreement, which is not subject to an insolvency exclusion.  See Pl.'s Opp. at 25.  The Management Liability Insuring Agreement offers liability coverage for the directors and officers, and liability and indemnification for the company, for claims for Management Practices Acts.  See Management Liability Insuring Agreement ("Management Liability Agreement"), Ex. A to Pl.'s Opp., at WNB00018-21.  A "Management Practices Act" is defined as:

> (a) any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any Insured Person in their capacity as such, or in an Outside Position. . .; or (b) any matter claimed against the Insured Persons solely by reason of their serving in such capacity. . . .

See General Terms, at WNB00060.

The Management Liability Agreement does not include an insolvency exclusion.  See Management Liability Agreement, at WNB00019-21.  It does, however, include a Broad Form Professional Services Act Exclusion, which states:

> The Insurer shall not be liable for any Loss on account of any Claim made

against any Insured based upon, arising out of, or attributable to the
rendering of, or failure to render, any service to a customer of the
Company.

See Broad Form Professional Services Act Exclusion Endorsement

("Professional Services Exclusion"), Ex. A to Pl.'s Opp., at WNB00038.

Defendants argue that the Management Liability Agreement is inapplicable to the

investors' claims because of this professional services exclusion.  See Def.'s

Mem. at 8 n.6.

Plaintiffs argue that the professional services exclusion "essentially

eviscerates [their] errors-and-omissions liability Policy, as virtually every action

taken by a bank involves '[t]he rendering of, or failure to render, any service to a

customer.'" See Pl.'s Opp. at 25 n.6.   Plaintiffs argue that, if this is such a broad

exclusion, it creates an ambiguity in the policy, which should be resolved in favor

of maximum coverage.  See id.

Under Connecticut law, a court interpreting an insurance contract must

"consider all relevant portions together, and, if possible, give operative effect to

every provision in order to reach a reasonable overall result."  See R.T.

Vanderbilt Co. v. Cont'l Cas. Co., 273 Conn. 448, 462 (Conn. 2005).  An

insurance contract must be "viewed in its entirety."  See Imperial Cas. & Indem.

Co. v. State, 246 Conn. 313, 324-325 (Conn. 1998)

This Policy includes several different Insuring Agreements, each of which

provide coverage for different aspects of liability.  The Professional Services

Agreement covers errors and omissions actually or allegedly committed by any

Insured in the rendering or failure to render any services performed for a

21

customer.  See Professional Services Agreement; General Terms.  Thus, the

Professional Services Exclusion of the Management Liability Agreement does

not eviscerate plaintiffs' coverage under the Policy, because those actions it

excludes are covered under the Professional Services Agreement (subject, of

course, to the exclusions of that Professional Services Agreement).  Considering

the Professional Services Agreement and the Management Liability Agreement

together, it is entirely reasonable that professional services (i.e., rendering

services for customers) are excluded from the Management Liability Agreement,

because such services are covered by their own, separate Agreement, albeit

subject to limited exclusions itself.

Additionally, the Management Liability Agreement is not rendered

extraneous due to its exclusion of professional services, despite plaintiffs'

argument that "virtually every action taken by a bank" involves service to

customers.  The Management Liability Agreement covers directors and officers,

as well as employees, in their positions as such.  See General Terms at

WNB00059-60; Policy Declarations, Ex. A to Pl.'s Opp., at WNB00016.  Not

every action or omission by a bank director, officer, or employee is done in the

performance of a service for a customer.  Actions are taken with regard to

shareholders (or members) and regulators, for example.

Finally, the court notes that plaintiffs do not argue that the language of the

Professional Services Exclusion itself is ambiguous.  Giving the words of the

exclusion in the Professional Services Exclusion their plain meaning, the court

determines that the language of the exclusion is unambiguous and that the

investors' claims fall within the exclusion.  The investors refer to themselves as "customers" of the plaintiffs.  See, e.g., Levinson Complaint at ¶ 3.  The Connecticut Supreme Court has stated that "[t]he fundamental characteristic of a customer is the purchase of a service or a commodity from another."  Jim's Auto Body v. Comm'r of Motor Vehicles, 285 Conn. 794, 808 (Conn. 2008).  The plaintiffs alleged that they provided "custodial services" and "ministerial services" to the investors.  See, e.g., Second Am. Compl. at ¶ 16.  Thus, the investors were unambiguously "customers" of the plaintiffs within the meaning of this exclusion.  The investors' claims arise out of the plaintiffs' "rendering of, or failure to render" services.  The plaintiffs' own description of the investors' claims discusses the provision of, or performance of certain services.  See Second Am. Compl. at ¶ 16; see also Levinson Compl. at ¶ 33, 40 (detailing services plaintiffs agreed to provide and alleged failure to provide such services).  Therefore, the investors' claims fall within the Professional Services Exclusion, and plaintiffs cannot claim coverage under the Management Liability Agreement.

Plaintiffs also argue that they are seeking coverage under the Management Liability Agreement for acts performed by Clark that do not involve rendering services to a customer.  See Pl.'s Opp. at 25-26 n. 6.  Plaintiffs make this argument because defendants can avoid the duty to defend only if there is no potential for coverage.  See R.T. Vanderbilt Co., 273 Conn. at 473 n.28. Clark is named as a defendant in only the Levinson Complaint.  See Second Am. Compl. at ¶ 15.  In the Levinson complaint, Clark is named in every claim but one: the claim for breach of contract.  See Levinson Compl. at ¶¶ 63-125.

Therefore, as this court has already determined that the investors' claims, which include the Levinson Complaint, fall within the Professional Services Exclusion, the Professional Services Exclusion of the Management Liability Agreement also applies to Clark.  In the Levinson Complaint, the investors claim that Clark "was the individual at Westport who handled [the investors'] accounts and communicated with the Plaintiffs and Class Members regarding them."  See Levinson Complaint at ¶ 32.  This court understands that description, under its plainest meaning, to include services rendered to customers.  Additionally, Clark is being sued for the same claims as the other defendants (e.g., negligence, fraud, breach of fiduciary duty), which have already been determined, see supra at 20,  to include services rendered to customers.  Therefore, the claims against Clark fall under the Professional Services Exclusion, and plaintiffs cannot claim coverage for Clark under the Management Liability Agreement.

Because the investors' claims fall squarely within an unambiguous reading of either the insolvency exclusion of the Professional Services Liability Coverage, or the professional services exclusion of the Management Liability Agreement, the Policy provides no coverage for plaintiffs, and defendants therefore have no duty to advance defense costs.  Because there is no coverage, plaintiffs have failed to state a claim.  Therefore, the Motion to Dismiss is granted.[6]

D.    Motion to Strike

Plaintiffs have moved the court to strike all references to Endorsement

---

[6] Because the court has decided the case on the defendant's 12(b)(6) argument, it need not address the defendants' other arguments.

CB108 to the Management Liability Agreement in defendants' Reply.  <u>See</u> Mot.

to Strike at 1 (Doc. No. 42).  Because the court did not refer to or rely on that

Endorsement or defendants' arguments concerning it in reaching its decision, the

Motion to Strike is granted.

      E.    <u>Right to Replead</u>

     Normally, the court would allow plaintiffs the right to replead their case,

especially as their Second Amended Complaint included conclusory language.

The Second Circuit "strongly favors liberal grant of an opportunity to replead after

dismissal of a complaint under Rule 12(b)(6)."  <u>See</u> <u>Porat v. Lincoln Towers</u>

<u>Cmty. Ass'n</u>, 464 F.3d 274, 276 (2d Cir. 2006).  There are, however,

circumstances in which dismissal with leave to amend is inappropriate.  <u>See</u>,

<u>e.g.</u>, <u>Joblove v. Barr Labs., Inc.</u>, 429 F.3d 370, 404 (2d Cir. 2005)(holding "where

amendment would be futile, denial of leave to amend is proper").  Here, any

amendment by plaintiffs would be futile.  First, this court has determined that the

insolvency exclusion does not rest on the actions of the plaintiffs but on the

underlying claims of the investors, which plaintiffs cannot change.  Additionally,

both in their papers and at oral argument, plaintiffs made it clear that their

position was that the insolvency exclusion only applied to cases in which the

party seeking coverage proximately caused the insolvency.  This is directly

contradicted by the Connecticut Supreme Court in <u>Hogle v. Hogle</u>.  <u>See</u> 261

Conn. at 48 ("Under [the 'arising out of'] standard of causation, it need not be

shown that the incident in question was proximately caused by the vehicle for

coverage to attach.")  Consequently, there is no amendment plaintiffs could

make that would affect the coverage of their claims, and thus the court does not grant plaintiffs a right to replead their claim.

Because the court did not address this issue at oral argument, the court grants plaintiffs leave to move to reopen within 21 days of this Ruling so long as plaintiffs attach a proposed Third Amended Complaint that states a claim within the standards set forth in this Ruling.

## V.   CONCLUSION

For the forgoing reasons, defendants' Motion to Dismiss (Doc. No. 32) is **GRANTED** and plaintiffs are not granted a right to replead.  Plaintiffs' Motion to Strike (Doc. No. 42) is **GRANTED**.  The Clerk is directed to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 7th day of April, 2010.


 /s/ Janet C. Hall
Janet C.  Hall
United States District Judge

26